### THOMPSON v. POST & McCORD.

(Supreme Court, Appellate Division, First Department.   March 10, 1911.)

1. APPEAL AND ERROR (§ 1001*)—VERDICT—CONCLUSIVENESS.

   Where the rulings of the trial court in admitting or rejecting evidence and in giving instructions are correct and are not questioned, a verdict for plaintiff presenting a prima facie case can be disturbed on appeal only on the theory that the verdict is against the weight of the evidence.

   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934;  Dec. Dig. § 1001.*]

2. MASTER AND SERVANT (§ 97*)—INJURY TO SERVANT—NEGLIGENCE.

   A structural ironworker was killed by a horizontal beam lifted from its place by a load hoisted from a derrick falling on him. His duty was to guide the load. Had the machinery been operated in the ordinary manner, the accident could not have occurred, and the accident was caused either by a coemployé giving a signal to hoist the load before decedent and his assistant were in a position to guide the load, or by the failure of decedent to perform his duty to guide it. To cause the beam to fall, it was necessary that the load when striking it should lift it more than a foot at one end. Held, that the master was not negligent in failing to foresee and guard against the accident.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 163;  Dec. Dig. § 97.*]

3. MASTER AND SERVANT (§ 252*)—INJURY TO SERVANT—NOTICE.

   Under Employer's Liability Act (Consol. Laws, c. 31) § 201, requiring notice of the time, place, and cause of an injury, and providing that

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

unintentional inaccuracy as to the cause, which has not been prejudicial, shall not affect the validity of the notice, a notice of injury to an employer, which avers that on described premises decedent, while at work in erecting a building for his employer, received fatal injuries caused by the negligence of one intrusted with and exercising superintendence in the operation of a derrick and the placing of a beam on the building, and by reason of the negligence of the employer or of its superintendent in the use of improper machinery used in the work, is fatally defective for failing to state the physical cause of the injury resulting in the employé's death.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 806; Dec. Dig. § 252.*]

4. MASTER AND SERVANT (§ 189*)—INJURY TO SERVANT—FELLOW SERVANTS.
Where one constructing a building employed a superintendent and two assistants, and divided his employés into gangs of men performing separate functions, under the immediate direction of a pusher, a pusher, while assisting the members of his gang, and in giving orders for the work, was a fellow servant of the members, and the master was not liable for his negligence resulting in their injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 431; Dec. Dig. § 189.*]

Appeal from Trial Term, New York County.

Action by Lena Thompson, as administratrix of Edward Anderson, deceased, against Post & McCord. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed, and complaint dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and MILLER, JJ.

Frank V. Johnson, for appellant.
G. Washbourne Smith, for respondent.

LAUGHLIN, J. This is a statutory action to recover for the death of Edward Anderson, alleged to have been caused by the negligence of the defendant, a domestic building corporation. The defendant had the contract for furnishing and erecting the structural ironwork on the building known as the City Investment Building, at the southwesterly corner of Broadway and Cortlandt street, extending through to Church street, in the borough of Manhattan, New York, the dimensions of which are 311 feet by 130 or 140 feet, and the decedent was in its employ, classified as an ironworker. The accident occurred on the 22d day of June, 1907. At that time the structural ironwork had been completed to the sixth floor and partly above that point.

The defendant employed a general superintendent and two assistant superintendents, one for the easterly and the other for the westerly half of the building. Under the superintendent and assistant superintendents, the employés were divided into small gangs of from five to seven or eight men, performing separate functions, under the immediate direction of a "pusher" or foreman. There were six erecting, or derrick, gangs, three employed on the easterly and three on the westerly half of the building. Each of these gangs had a derrick operated by steam power from an engine in the basement or at the ground floor, and their duties were to hoist the iron girders, columns,

and floor beams, and put and fasten them together, with the exception of the riveting work, which was done by eight other gangs known as riveters. All of the members of these gangs were classified as ironworkers. The gang with which the decedent was working consisted of one Edwards, a pusher or foreman, and seven other men, including the decedent. The members of each gang were assigned to duties by the pusher. One of the members was known as a "bellman," and it was his duty to communicate signals given to him by the pusher or other members of the gang, or which from his experience he knew it to be his duty to give, to the engineer by pulling a bell cord. Another was known as the "stickman." He had charge of steadying the beam while the derrick was in operation, and of moving the boom from right to left when required, which he could do by pulling on a stick or lever inserted in a socket, whereby the mast of the derrick would revolve, taking the boom around with it. Two members of the gang were known as "hookers-on" or "tag line men," and, acting separately or together, performed the duties of passing a sling around the material to be hoisted and hooking the fall into the sling, and then, as the load was lifted from the ground or floor, they or one of them attached a guy rope thereto, by means of which the load was steadied and guided while it was being hoisted. The other members of the gang were known as connectors, and it was their duty to receive the iron when hoisted to the position for which it was intended, and to assist in landing it in the proper position and temporarily connect it, when necessary, by inserting bolts and screwing on nuts to secure it in place until the riveters completed the work.

On the day in question the derrick used by decedent's gang was on the sixth floor, where it had been used for some time. It was evidently a very high derrick, for it had a boom 75 or 80 feet long, and, while it was necessary to lower and raise the boom and swing it from right to left at times, it is to be inferred that it was not necessary to move the derrick after it had once been placed in position on a given floor. Perpendicular column beams had been installed, extending up to the ninth floor, but the horizontal column beams to connect them had not been put in place. Edwards announced to the members of his gang his intention to hoist three column beams to connect the upright columns in the same panel on the seventh, eighth, and ninth floors, and the boom of the derrick was swung to the proper position for the performance of this work. The column beams were on the sixth floor, and were about 15 feet in length, 1 foot in depth, as they would be in place in the floor, and they had flanges at the top and bottom about 5 inches in width, and the web was about $\frac{3}{8}$ of an inch in thickness, and weighed from 600 to 800 pounds. A sling was passed around one of the beams and the fall was attached, and the beam was hoisted to the seventh floor, Edwards riding upon it and signaling the bellman with respect to swinging and lowering it into place. The upright column beams were about 14 inches thick by 20 or 22 inches wide, and on the sides to which these horizontal column beams were to be attached they had flanges extending out from 5 to 7 inches, and between these flanges at the respective floor lines lugs were attached to the column beams of the same width as the

flanges, forming shelves on which the ends of the horizontal column beams were to rest. The horizontal beams were designed to extend from one upright to the other, and there was only a margin of a quarter of an inch between the length of the horizontal column beams and the longest distance between the upright column beams. The practice was, as these facts would seem to require, to swing one end of the horizontal beam into place, and then to elevate the other end sufficiently to pass the flanges of the upright, and then to drop it into place. There were two holes in each end of the horizontal beams, and corresponding holes in the lugs. The connectors carried bolts and wrenches for the purpose of securing columns in place temporarily, when necessary; and in some instances, where the method of attachment was quite different, a horizontal beam would not remain in place after the fall was detached without being bolted. One of the connectors assisted Edwards in landing this column, and two others had gone above evidently with a view to receiving one of the other columns to be hoisted. As soon as this column was put in place at the seventh floor, Edwards called out "All off," from which the bellman understood that he should signal the engineer to slacken the cable so that the sling could be unhooked. This was done, and the bellman then signaled the engineer to allow the fall to be lowered. The cable was steel, and, in order to bring the hook on the fall down to the floor from which the load was to be hoisted, it was necessary to attach a weight between the block and the hook. A cast steel ball about 12 or 14 inches in diameter and 22 inches in length, somewhat oval in shape and weighing from 600 to 800 pounds, was used for this purpose; and, as the cable was let out by the engineer on a signal from the bellman, this weight took the block and fall down. The decedent and one Cunningham were and had been for a considerable period of time acting as the hookers-on or tag line men. Usually Cunningham hooked on and the decedent attached and attended to the tag line. Cunningham passed a sling around the column intended for the eighth floor and hooked it on, and the bellman, who was on the same floor and in a position to observe this, signaled the engineer to hoist the load, and it was lifted a few feet above the floor, and then stopped for the purpose of steadying it and attaching the guy rope. The decedent attached a guy rope near the ball which has been described, and extended it along and nearly to one end of the column, and then took a turn of it around the column with a view to steadying and guiding it as it was hoisted. The bellman again, without further direction, concluded that everything was ready, and gave the signal to the engineer to hoist at full speed until notified to stop. The signal was obeyed, and it clearly appears that the load was hoisted while decedent was stooping over coiling up the guy rope to prevent its fouling and before he was ready to guide it, and before Cunningham was able to go to his assistance in guiding it, with the result that the ball struck one end of the beam which had just before been put in place at the seventh floor, but had not been secured in place otherwise than as already described, and the end was lifted from the lug, and either in consequence thereof, or because the beam which was being hoisted also struck the seventh floor beam, that beam was lifted

out of position sufficiently to pass the flanges on the upright column, and it dropped to the floor and struck the decedent and caused his death.

The action is sought to be maintained under the employer's liability act (Consol. Laws, c. 31) on the theory that the pusher was a superintendent, or engaged in superintendence, within the meaning of that statute, and that he was guilty of negligence in detaching the fall from the beam which had been put in place at the seventh floor before bolts were inserted through the ends of it and secured by nuts. The learned trial justice carefully confined the evidence to this issue, and he submitted to the jury on the evidence, which was conflicting, the question as to whether Edwards' principal duties were those of superintendence, and instructed the jury by a very clear and impartial charge that this was the only theory upon which the liability of the defendant could be predicated. No ruling of the learned trial justice in receiving or excluding evidence, or in instructing the jury, is questioned or questionable. Therefore, if the plaintiff presented a prima facie case, the judgment can be disturbed only upon the theory that the verdict is against the weight of the evidence. On that question we are of opinion that the verdict should not be permitted to stand. There was testimony given in behalf of the plaintiff to the effect that Edwards' order "All off," when he was about to unhook the sling from the first beam which had been hoisted, meant that the bellman should signal the engineer to lower the hoist, and that the other beam should be hoisted at once to the eighth floor, and also to the effect that he added to the words "All off" language constituting an express instruction to hoist the other beam. Many witnesses, however, including Edwards, testified that he gave no order or instructions other than by using the expression "All off"; and this is quite probable, for the other men of his gang understood their duties and what was desired without further instructions. The bellman, after giving various conflicting versions of what Edwards said, concedes that if Edwards said nothing but "All off," he would understand that it was his duty, without further order, to signal the engineer to lower the fall, and that the other members of the gang would then proceed with the work, and that according to the usual course of business in the performance of this routine work daily, without any signal from the hookers-on or any one else, he would signal the engineer to lift the load when it appeared to him to be ready to be lifted, as he did on this occasion. Moreover, it is apparent from his testimony that the accident was caused either by his giving a signal to hoist the column at full speed before the decedent and Cunningham were in a position to steady and guide it, or by the failure of the decedent to perform his duty to guide it. It is manifest that such a weight suspended on a cable from the boom of a derrick from 60 to 80 feet above would sway and swing if hoisted rapidly unless carefully started and guided, and this was the purpose for which the guy rope was intended. It does appear that occasionally in hoisting such girders the ball came in contact with and bumped a beam, girder, or column, and while it may be that the force of the contact between the ball and this beam, or between the other beam and it, was not sufficient to tear the beam

out of place had it been securely bolted, still, had the machinery been operated in the ordinary manner and the employés performed their duties, there was no necessity for bumping this beam in such a manner as to lift it out of place, which, according to the evidence, required lifting it more than a foot at one end, and we think it was not negligence not to foresee and guard against such an accident. Moreover, it cannot fairly be said that the accident was due to unhooking the sling before the beam was bolted and secured in place, nor was it caused by the order, if an order was given, to lower the fall and hook onto the other beam. The beam which fell was perfectly secured in its place, had it not been lifted so far out of place. If therefore, there was any negligence in superintendence, it was not in allowing preparation for hoisting the other beam to be made before the beam which fell was securely bolted, but in not giving an order to stay the hoisting of the other column until the first one hoisted was securely bolted.

We are of opinion, also, that the notice served in an attempt to comply with the requirements of the employer's liability act was insufficient. The notice states the alleged negligent cause of death, but it fails to state the physical cause thereof. It gives notice that on the 22d day of June, 1907, on the premises situated on the southeast corner of Church and Cortlandt streets—the building ran through from Broadway to Church street—in the borough of Manhattan, New York, where certain building operations were being conducted by defendant, the decedent while at work in defendant's employ "received injuries from which he died," and the only provision of the notice which has any possible bearing on the physical cause of the injuries is that they were caused by the negligence of the defendant, or of a person or persons in its employ intrusted with and exercising superintendence, or acting as superintendent, "in the operation of a derrick and the placing of a certain beam," and by reason of the negligence of the defendant or of its superintendent "in the use of improper, unsafe, and inadequate machinery and appliances connected with and used in your said work, and by reason of defects in the ways, works, and machinery connected with and used in your said business." Under the ruling of the Court of Appeals in Logerto v. Central Building Co., 198 N. Y. 390, 91 N. E. 782, this notice appears to be fatally defective in not stating the physical cause of the injuries which resulted in the death of plaintiff's intestate. We must assume, in view of that decision, that a notice cannot be saved under section 2 of the employer's liability act on the theory of unintentional inaccuracy with respect to the cause, which has not been prejudicial, where there has been no physical cause stated at all. The defendant duly objected to the admission of the notice in evidence, on the ground that it was insufficient, and it moved for a nonsuit on the same ground, and at the close of the evidence moved to strike out the notice and for a dismissal of the complaint and for the direction of a verdict on the ground that the notice was insufficient. We are of opinion that these objections and motions were well founded, and should have been sustained and granted. It is manifest that there is no cause of action at common law on the facts pleaded or proved, for the rea-

son that at common law any negligence on the part of the pusher would be the negligence of a coemployé, for which the defendant would not be liable. It is evident, therefore, that a new trial cannot avail the plaintiff, and the complaint may as well be dismissed.

It follows that the judgment and order should be reversed, with costs, and the complaint should be dismissed, with costs.

INGRAHAM, P. J., and McLAUGHLIN and SCOTT, JJ., concur. MILLER, J., concurs on the last ground.